**SO ORDERED.**

**SIGNED this 29th day of September, 2015.**



_Catharine R Aron_
_____
UNITED STATES BANKRUPTCY JUDGE

---

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CLEAN BURN FUELS, LLC, | ) | Case No. 11-80562 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| SARA A. CONTI, Chapter 7 | ) | |
| Trustee for CLEAN BURN FUELS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 13-09012 |
| | ) | |
| v. | ) | |
| | ) | |
| PERDUE BIOENERGY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

THIS MATTER came on for hearing on April 27, 2015, in Durham, North Carolina,

upon the cross-motions for summary judgment filed by Sara Conti, Chapter 7 Trustee for Clean

Burn Fuels, LLC ("Clean Burn") and Perdue BioEnergy, LLC ("Perdue").  At the hearing, Vicki

Parrott and JP Cournoyer appeared on behalf of Clean Burn, and Gregory Crampton, Steven

Newton, Carey Deeley, and Andrew Currie appeared on behalf of Perdue.

Clean Burn filed a preference action seeking to avoid $14,958,293.07 in payments made to Perdue.  Presently, Clean Burn seeks summary judgment on the prima facie elements of a preference under 11 U.S.C. § 547(b) and on Perdue's affirmative defenses under 11 U.S.C. §§ 546(e) and (g).  Concurrently, Perdue seeks summary judgment on its affirmative defenses found in 11 U.S.C. §§ 546(e), (g), and 11 U.S.C. § 547(c).[1]

After reviewing the record and considering the arguments from counsel, this Court finds that the Trustee is entitled to summary judgment as to the prima facie elements of her preference claim.  Notwithstanding this finding, Perdue may invoke the limitation on the Trustee's avoidance power under § 546(e), and there is a factual dispute as to which transactions qualify under this defense.  For those transactions that do not qualify for the § 546(e) safe harbor, Perdue may also invoke its § 547(c) defenses.  However, due to this Court's previous opinion and certain factual issues, summary judgment is not appropriate as to the § 547(c) defenses.

## JURISDICTION

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 83.11 of the District Court for the Middle District of North Carolina.  This is a core proceeding under 28 U.S.C. § 157(b)(2) which this Court may hear and determine.  To the extent that this Court's constitutional authority to enter a final judgment in this matter is questioned under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), both parties have consented to this Court's adjudication.  *See Wellness Int'l Network, Ltd. v. Sharif*,

---

[1] Perdue's § 546(g) defense incorporates the same argument as its § 546(e) defense, *inter alia*, that the payments made by Clean Burn to Perdue were pursuant to forward contracts.  Thus, Perdue's § 546(g) defense will be considered along with its § 546(e) defense.

135 S.Ct. 1932, 1944 (2015) (allowing parties to "waive the right to Article III adjudication of *Stern* claims").[2]

## BACKGROUND

Clean Burn operated an ethanol facility in Raeford, North Carolina, to convert corn into ethanol and a by-product known as dried distillers grain with solubles. Clean Burn entered into a series of related contracts with Perdue for the purpose of procuring corn. These contracts included a Feedstock Supply Agreement, a Co-Product Purchase and Marketing Agreement, a Lease Agreement, and a Master Agreement.

The Feedstock Supply Agreement controlled the procurement and purchase of corn and other related services between Clean Burn and Perdue. Under the Feedstock Supply Agreement, Clean Burn agreed to purchase corn exclusively from Perdue. In exchange, Perdue agreed to provide a number of different services. One such service concerned the origination, or procurement, of corn. Perdue agreed to supply all of Clean Burn's requirements of corn with a special provision that Perdue source twenty percent of all corn from local farmers. In addition to supplying the corn, Perdue agreed to manage the logistics of transporting the corn to Clean Burn's facility by either rail or truck and to employ an on-site logistics coordinator.

Clean Burn's facility included two storage bins connected to a processing plant. All deliveries of corn were deposited into the storage bins, which were owned by Clean Burn but leased to Perdue for $1.00 per year. When it needed corn, Clean Burn would draw it out from

---

[2] In its Amended Answer, Perdue did not consent to this Court's entry of a final judgment. *See* Perdue's Amended Answer, ¶ 1 [Doc. No. 17]. However, Perdue later requested this Court to enter final judgment in its Motion for Summary Judgment. The Supreme Court, in allowing parties to impliedly consent to bankruptcy courts' jurisdiction, noted that such a rule promotes the "pragmatic virtue[]" of "checking gamesmanship." *Wellness*, 135 S.Ct. at 1948; s*ee also Haley v. Barlays Bank Del. (In re Carter)*, 506 B.R. 83, 88 (Bankr. D. Ariz. 2014) ("If a *Stern* objection were not deemed waived by the party making it seeking summary judgment, then the party could seek or permit a substantive ruling by the Bankruptcy Court, and then waive that objection if the ruling is favorable but insist on it if unfavorable, and get a second bite at the apple."). To prevent the gamesmanship described in *Haley*, this Court will interpret Perdue's Motion for Summary Judgment as its consent to this Court's entry of a final judgment.

the storage bins using a conveyor belt. As corn traveled on the conveyor belt it would pass over an instrument called a weighbelt. The weighbelt measured Clean Burn's daily corn usage. This data was transmitted to Perdue, and Perdue used the data from the weighbelt to determine the total price of the corn sold.

The pricing mechanism for the corn was complex. According to the Feedstock Supply Agreement, the total price of corn was comprised of a basis price—calculated based on the transportation method used, the storage capacity of the transportation, and a fixed origination fee—and a futures price—an amount tied to the price of corn trading on a particular month on the Chicago Board of Trade. Over the course of their relationship the parties entered into seven basis contracts, which governed the basis price for future transactions within a set period of time. After entering into a basis contract, the parties would enter into weekly agreements that would establish the quantity and futures price of the corn on either the Thursday or Friday before the corn was to be pulled out of the bins for the following week's usage. Once the futures price was set, the full contract price between Clean Burn and Perdue was established, allowing Clean Burn to draw corn out of the storage bins and across the weighbelt. In other words, the parties anticipated that the full price and quantity of the corn would be determined before the corn passed over the weighbelt.

Clean Burn's payment terms varied over the parties' relationship. Under the Feedstock Supply Agreement, Clean Burn was required to pay fifteen percent of the invoice price on the same day the invoice was sent, with the balance due on Friday of the same week. The parties, however, altered this schedule several times. In January 2011, the parties changed the payment schedule to require a twenty percent payment on the Friday following receipt of the invoice, with the remaining eighty percent to be paid on the following Friday. All of the payments made

pursuant to this last payment schedule were within the ninety day period before Clean Burn filed for Chapter 11 (the "Preference Period"). In the Preference Period, Clean Burn made sixteen payments to Perdue for a total amount of $14,958,293.07.

Eventually, the high cost of corn coupled with the low market value of ethanol resulted in an insufficient cash flow for Clean Burn to continue its business operations. On February 28, 2011, Clean Burn stopped removing grain from the storage bins. Shortly thereafter, Perdue's on-site employee locked the weighbelt, preventing further corn withdrawals. By the time Clean Burn filed for Chapter 11 on April 3, 2011, 553,000 bushels of corn with an approximate value of $4,675,000.00 remained in the storage bins. Clean Burn filed an adversary proceeding (the "Corn Litigation") to determine the ownership of the remaining corn, avoid a potential ownership interest retained by Perdue in the corn under 11 U.S.C. §§ 544(a) and 549, and recover the value of the corn under 11 U.S.C. § 550. Both parties moved for partial summary judgment; this Court granted Clean Burn's motion. *Clean Burn Fuels, LLC v. Perdue BioEnergy, LLC et al. (In re Clean Burn Fuels, LLC)*, 492 B.R. 445 (Bankr. M.D.N.C. 2013).

In the Corn Litigation this Court determined that the corn held in the storage bins when Clean Burn filed for Chapter 11 was property of the bankruptcy estate.[3] Relying on N.C. Gen. Stat. § 25-2-401, this Court determined that Perdue delivered the corn, at the latest, when it arrived at Clean Burn's facility. *Id.* at 462. The determination of when delivery occurred was a pivotal component in this Court's ultimate holding that Perdue failed to perfect its security interest, thereby allowing the Trustee to avoid Perdue's security interest under § 544(a). *Id.* at 464. Perdue filed a notice of appeal, and the matter is currently under advisement before the District Court for the Middle District of North Carolina.

---

[3] The opinion from the Corn Litigation was entered by the Hon. Thomas W. Waldrep, Jr.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, made applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, states that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine dispute is one in which "the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  "In particular, the relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 199 (4th Cir. 2005) (*quoting Anderson*, 447 U.S. at 251-52).

## DISCUSSION

I.     Law of the Case

Before discussing the merits of the motions before the Court, a preliminary issue must be resolved as to the impact of this Court's previous ruling in the Corn Litigation.  Perdue maintains that this Court's determination of when delivery occurred should not control the Court's analysis in the present action.  Clean Burn disagrees, arguing that this Court's earlier decision is binding. Under the principle of law of the case, this Court agrees with Clean Burn.

Law of the case stands for the principle "that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Walker v. Kelly*, 589 F.3d 127, 137 (4th Cir. 2009) (*quoting United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)).  This doctrine promotes the policies of judicial economy and finality. *Id.*  As such, it reflects "a prudent judicial response to the public policy favoring an end to litigation."  *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 68 (4th Cir. 1988).  Law of the case is not only adopted in appellate proceedings, but also in bankruptcy matters as well.  *See, e.g.*, *New Bern Riverfront Dev., LLC v. Weaver Cooke Constr., LLC (In re New Bern Riverfront Dev., LLC)*, 516 B.R. 316, 321 (Bankr. E.D.N.C. 2014) (applying law of the case within the same adversary proceeding).  The pendency of an appeal does not impact the law of the case doctrine. *Burtch v. Masiz (In re Vaso Active Pharm., Inc.)*, 500 B.R. 384, 399 (Bankr. D.  Del. 2013) (applying law of the case "notwithstanding the appeal currently pending in District Court.").[4]

This Court's previous determination that delivery occurred pursuant to N.C. Gen. Stat. § 25-2-401 is law of the case in the current adversary proceeding.  Perdue made the same argument to this Court during the Corn Litigation that the Feedstock Supply Agreement, not North Carolina law, should dictate when delivery of the corn occurred.  After careful consideration, this Court entered a final order applying North Carolina law, finding that the delivery of corn occurred, at the very latest, when it reached Clean Burn's facility.  There is no compelling reason to adopt a different definition of delivery in the Corn Litigation from the current matter. Therefore, this Court's previous ruling on delivery will continue to govern in the present case.

---

[4] While this Court entered a consent order granting Perdue's motion to stay both the May 16, 2013 Memorandum Opinion and the June 28, 2013 Final Judgment,  conclusions of law made therein still stand for the purposes of law of the case, unless and until the District Court vacates them.

II.      Prima Facie Case

In order to satisfy a prima facie case for a preference action, Clean Burn must prove six elements: 1) the existence of a transfer of an interest of the debtor in property; 2) the transfer was made to or for the benefit of a creditor; 3) the transfer was made for or on account of an antecedent debt owed by the debtor before the transfer was made; 4) the transfer was made while the debtor was insolvent; 5) the transfer was made within ninety days before the date of the filing of the petition; and 6) the transfer enables the creditor to receive more than it would receive in a hypothetical Chapter 7 distribution.  11 U.S.C. § 547(b).  Clean Burn carries the burden on all six elements.  11 U.S.C. § 547(g).

Perdue has already admitted to several of the elements of Clean Burn's preferential transfer claim.  In its Amended Answer, Perdue admitted that it was a creditor of Clean Burn and that Clean Burn transferred its property to Perdue during the Preference Period, satisfying the first, second, and fifth elements.  In the Corn Litigation, Perdue stipulated that Clean Burn was insolvent during the ninety days prior to its Chapter 11 petition, satisfying the fourth element.  Final Pre-Trial Order, *Clean Burn Fuels, LLC, v. Perdue BioEnery*, Ch. 7 Case No. 11-80562, Adv. No. 11-09046, Doc. No. 186.  Perdue therefore disputes only the third and sixth elements.

These two remaining elements are easily satisfied.  The Fourth Circuit has adopted a "common sense approach" to determine if a transfer was made for antecedent debt: "whether the creditor would be able to assert a claim against the estate, absent repayment." *Smith v. Creative Fin. Mgmt., Inc. (In re Virginia—Carolina Fin. Corp.)*, 954 F.2d 193, 197 (4th Cir. 1992).  Had Clean Burn not made the transfers during the Preference Period, Perdue would have been able to assert a claim against Clean Burn's estate for repayment.  Moreover, Perdue received more than it would have received in a hypothetical Chapter 7. *See Buchwald Cap. Advisors LLC v. Metl-*

*Span I., Ltd (In re Pameco Corp.)*, 356 B.R. 327, 337 (Bankr. S.D.N.Y. 2006) ("[T]here is no dispute that the anticipated recovery of unsecured creditors under the Plan will be less than 100 cents on the dollar, Defendant clearly recovered from the Debtor more than it would have in a hypothetical Chapter 7 liquidation…").  While it is unclear what the dividend to creditors will be, it will likely be less than one hundred percent.  Therefore, the Court finds that Clean Burn satisfied its prima facie case for a preference action under § 547(b).

III.    Section 546(e) defense

A trustee's power to avoid preferential transfers is not without restraint.  Section 546(e) limits a trustee's avoidance power by stating that "the trustee may not avoid a transfer that is a…settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a…forward contract merchant…in connection with…a forward contract, that is made before the commencement of the case, except under section 548(a)(2)(A) of this title."  11 U.S.C. § 546(e).  In order to qualify for this exception to the trustee's avoidance power, a transferee must prove three things: 1) the existence of a forward contract; 2) the settlement payments were made pursuant to the forward contract; and 3) the settlement payments were made by, to, or for the benefit of a forward contract merchant.  *Id.*

A.  Forward contract

1.  Differing Definitions of a Forward Contract

According to Perdue, a forward contract is explicitly defined in the Bankruptcy Code. Section 101(25)(A) lists three requirements: 1) the contract is for the purchase of a commodity; 2) the contract is not a commodity contract as defined in 11 U.S.C. § 761; and 3) the contract has a maturity date of more than two days after the contract was entered into.  11 U.S.C. §

101(25)(A).  According to Perdue, the statutory elements, and only these elements, form the definition of a forward contract.

Clean Burn relies on case law to expound upon the definition of a forward contract.  In *Hutson v. E.I. du Pont de Nemours and Co., Inc. (In re Nat'l Gas Distribs., LLC)*, 556 F.3d 247 (4th Cir. 2009), the Fourth Circuit held that under § 546(g), a commodity forward agreement is not required to be traded on an exchange and may include the physical delivery of the commodity.  *Id.* at 259.  The Fourth Circuit arrived at this holding by unpacking the term "commodity forward agreement," which the Bankruptcy Code fails to define.  The Fourth Circuit began by comparing the terms "agreement" and "contract," to find that "[t]he term 'agreement'…is really an expression of greater breadth of meaning and less technicality [than 'contract']. Every contract is an agreement; but not every agreement is a contract." *Id.* at 255 (*quoting Black's Law Dictionary* 74 (8th ed. 2004)).  The Court then used the definition of a forward contract in § 101(25)(A) to define a commodity forward agreement, noting that all forward contracts must, at a minimum, have the elements of a forward agreement.  *Nat'l Gas Distribs.*, 556 F.3d at 256-57.  In remanding the case back to the bankruptcy court, the Fourth Circuit outlined four non-exhaustive elements required for all commodity forward agreements: 1) substantially all expected costs of performance are attributable to the underlying commodity; 2) the contract has a maturity date of more than two days after the contract was entered into; 3) the price, quantity, and time elements must be fixed at the time of contracting; and 4) the contract has a relationship to the financial markets.  *Id.* at 259-60.  Due to the Fourth Circuit's discussion of § 101(25)(A), Clean Burn claims that the four elements are essential in defining a forward contract.

Perdue strenuously argues against Clean Burn's use of *National Gas Distributors*.
Perdue correctly notes that *National Gas Distributors* interpreted a separate and distinct statutory
provision, 11 U.S.C. § 546(g), which concerns the avoidance of swap agreements.  Perdue also
claims that the Fourth Circuit's limited holding—that "the Bankruptcy Code does not require
that a 'forward contract' be traded on an exchange or in a market," and that "Congress did not
preclude physical delivery in connection with a 'commodity forward agreement'"—restrains any
application to § 546(e).  *Nat'l Gas Distribs.*, 556 F.3d at 256, 258.  Further, Perdue urges this
Court to consider a Fifth Circuit case that refused to apply the four elements laid out in *National
Gas Distributors*, because "the context of the court's discussion is intentionally open-
ended…and evocative rather than prescriptive."  *Lightfoot v. MXEnergy Elec., Inc. (Matter of
MBS Mgmt. Servs., Inc.)*, 690 F.3d 352, 356 (5th Cir. 2012).

Despite Perdue's arguments, this Court must apply *National Gas Distributors*.  Although
it is correct that the Fourth Circuit's holding explicitly applied to § 546(g), it is also true that
*National Gas Distributors* relied heavily on the definition of a forward contract in § 101(25)(A)
as the foundation for its decision.  By extrapolating the definitional components of a forward
contract to set out the requirements of a commodity forward agreement, the Fourth Circuit
necessarily spoke to the requirements of a forward contract.  Further, the Fourth Circuit created
elements, particularly the second and third elements, that were derived predominantly from its
analysis of § 101(25)(A)'s definition of a forward contract.  The second element, which requires
the price to be fixed at the time of contracting with a maturity date of more than two days after
contracting, was created with an explicit reference to § 101(25)(A).  *Nat'l Gas Distribs.*, 556
F.3d at 260.  The third element, which requires the quantity and time components to be fixed at

the time of contracting, was derived from two cases interpreting forward contracts[5] and a dictionary definition of a forward contract.[6]  *Id.*  Dismissing *National Gas Distributors* as merely a § 546(g) case adopts a strained reading of the Fourth Circuit's opinion not in keeping with its reasoning.  Further, this Court cannot accept the Fifth Circuit's reading in *MBS Management Services* in which that court understood the Fourth Circuit's four non-exhaustive elements as "evocative rather than prescriptive."  690 F.3d at 356.  The issue with this interpretation is that the Fourth Circuit did in fact prescribe the bankruptcy court to consider these very elements on remand.[7]  Recharacterizing these four elements as merely evocative overlooks the procedural posture of *National Gas Distributors* and is unwarrantedly dismissive.  Of course, this Court cannot forsake the statutory definition of a forward contract in favor of applying *National Gas Distributors*.  Therefore, the proper analysis of § 546(e) requires an analysis of § 101(25)(A) as informed by *National Gas Distributors*.

### 2.  Commodities and Commodity Contracts

Perdue satisfied the first two statutory elements for a forward contract.  Section 101(25)(A) defines a forward contract both negatively and positively.  In the negative sense, a forward contract cannot be a commodity contract as defined under 11 U.S.C. § 761, which includes a "contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade."  11 U.S.C. § 761(4)(A).  Positively speaking, a

---

[5] The Fourth Circuit cited *Williams v. Morgan Stanley Capital Grp. Inc. (In re Olympic Nat. Gas)*, 294 F.3d 737, 739 (5th Cir. 2002) (finding a contract fit the statutory definition of a forward contract where the price, quantity, and time elements were fixed at contract) and *BCP Liquidating LLC v. Bridgeline Gas Mktg., LLC (In re Borden Chems. & Plastics Operating Ltd. P'Ship)*, 336 B.R. 214, 221 (Bankr. D. Del. 2006) (determining that forward contracts have fixed quantities and prices).

[6] The Fourth Circuit cited the *Merriam-Webster's Dictionary of Law*'s definition of a forward contract as "a privately negotiated investment contract in which a buyer commits to purchase something (as a quantity of a commodity, security, or currency) at a predetermined price on a set future date."

[7] *In re Nat'l Gas Distribs.*, 556 F.3d at 259: "In determining whether the contracts in this case are 'commodity forward agreements,' the bankruptcy court will not, unfortunately, have the benefit of developed case law, nor even the benefit of clear market-place definitions . . . . Although we do not attempt to provide a definition ourselves, we can point to certain nonexclusive elements that the statutory language appears to require."

forward contract must be "for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title."  11 U.S.C. § 101(25)(A).  Section 761(8), in turn, cites to the Commodity Exchange Act's definition of a commodity, which includes corn.  *See* 7 U.S.C. § 1a(9).  Perdue correctly argues, and Clean Burn agrees, that the contracts at issue were not commodity contracts as defined in § 761 and that the contracts were for the sale of corn.

Clean Burn resists a neat application of § 101(25)(A) by arguing that meaningful portions of the contract are not attributable to the corn.  Clean Burn urges the Court to utilize the Fourth Circuit's requirement for commodity forward agreements, that "substantially all of the expected costs of performance must be attributable to the expected costs of the underlying commodity." *Nat'l Gas Distribs.*, 556 F.3d at 259.  Under this line of reasoning, Clean Burn argues that meaningful portions of the Feedstock Supply Agreement, such as the logistics and origination provisions, are not commodities.

Clean Burn's argument is not persuasive.  After announcing its rule, the Fourth Circuit contrasted forward commodity agreements, "in which the benefits or detriments depend on future fluctuations in commodity prices," with supply contracts, "in which costs attributable to other factors, such as packaging, marketing, transportation, service, and similar matters contribute to a greater portion of the costs." *Id.* at 259.  In other words, if the benefits or detriments of the contracts entered into were dependent on the fluctuations in the commodity market rather than on the non-commodity portions, then those contracts were substantially for the sale of a commodity.  During the Preference Period, the basis price, which reflected the cost for logistics and origination, ranged from $0.855 to $1.000, while the futures price, which reflected the cost of the corn, ranged from $5.665 to $7.100.  In comparing the two prices during the Preference Period, it is clear that the contract prices were predominantly attributable to the

corn such that the benefits or detriments of each contract depended on future fluctuations of corn prices.  Regardless of how meaningful the logistics and origination components were to Clean Burn, the contracts entered into during the Preference Period were substantially for the sale of corn. Therefore, the contracts at issue meet the first two elements for a forward contract as defined by § 101(25)(A).

### 3.   Maturity Date

The final requirement for a forward contract is that the contract at issue must have a maturity date more than two days after the contract was entered into.  11 U.S.C. § 101(25)(A). The Bankruptcy Code does not define "maturity date," and in its absence courts have adopted a variety of competing definitions.  Some courts understand a contract's maturity date as the date of delivery.  *See, e.g.*, *In re Olympic Nat'l. Gas*, 294 F.3d at 741 (substituting delivery date for maturity date); *In re Borden Chems. & Plastics Operating Ltd. P'ship*, 336 B.R. at 219 (tying maturity date to the contractual delivery date).  Other courts take a more nuanced approach, defining maturity date as "the future date at which the commodity must be bought or sold . . . that is the date on which the buyer's obligation to pay matures."  *McKittrick v. Gavilon, LLC (In re Cascade Grain Prods., LLC)*, 465 B.R. 570, 575 (Bankr. D. Or. 2011).  Confusingly, *National Gas Distributors* draws from both camps, stating simultaneously that a forward contract "must require a payment for the commodity at a price fixed at the time of contracting for delivery more than two days after the date the contract is entered into" and that "a maturity date in the future means that the benefit or detriment from the contract depends on future fluctuations in the market price of the commodity."  556 F.3d at 260.  Clean Burn urges the Court to adopt a definition of maturity date that is tied to the delivery date, while Perdue advocates for the more flexible definition.

While a contract's delivery date could sometimes serve as an adequate proxy for its maturity date, simply equating one with the other can lead to a perplexing result and is at odds with the statutory definition of a forward contract. To use the present case as an example, this Court previously determined that the corn was delivered, at the latest, when it arrived at Clean Burn's facility. After the corn was delivered to Clean Burn, it sat in storage bins that Clean Burn leased to Perdue until the parties agreed on a futures price, which finalized their contract. The issue with Clean Burn's definition is that any contract with Perdue would necessarily have a maturity date before the contract was finalized. Put another way, to adopt Clean Burn's definition would require accepting the premise that a contract can mature before either party could create it. Clean Burn argues that the inability of a contract to mature before it exists actually supports its contention that the contracts with Perdue were not forward contracts. This argument, however, is at odds with § 101(25)(A) because the statutory definition of a forward contract presumes that a contract's maturity date will follow the contract itself: "the term 'forward contract' means—a contract . . . with a maturity date more than two days after the date the contract is entered into . . ." 11 U.S.C. § 101(25)(A). Any definition of "maturity date" must allow for the contract to be entered into first. Because Clean Burn's interpretation does not follow this sequence, its definition of "maturity date" is not viable.

In contrast, Perdue's more flexible definition of "maturity date" does not lead to such perplexing results and is in keeping with the § 101(25)(A). Indeed, the legislative history of § 5456(e) lends support for Perdue's argument. While § 101(25)(A) does not provide a definition for "maturity date," Congress provided some guidance:

> The primary purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity. This purpose is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity.

H.R. Rep. 101-84, at 4 (1990).

Thus, Congress differentiated between two types of contracts: forward contracts and contracts for the purchase and sale of a commodity. By protecting forward contracts from preference actions, "Congress sought to prevent market instability when a commodities or securities firm became insolvent." *U.S. Bank Nat'l Ass'n v. Plains Mktg . Can. LP (In re Renew Energy, LLC)*, 463 B.R. 475, 479 (Bankr. W.D. Wis. 2011). To separate these two kinds of contracts, Congress wrote § 101(25)(A) such that contracts that mature more than two days after being entered into would be distinguished from contracts for the immediate sale of commodities. The more-than-two-days temporal requirement captures those contracts which serve to hedge against fluctuations of commodity prices and reflects their risk-shifting nature.

In light of the purpose behind protecting forward contracts, the statutory language at issue, and the practical ramifications of contrary interpretations, the better interpretation of § 101(25)(A)'s maturity date is the date "that the benefit or detriment from the contract depends on future fluctuations in the market price of the commodity." *Nat'l Gas Distribs.*, 556 F.3d at 260. Such a flexible result was anticipated by Congress in describing forward contracts: "If the price of a commodity…rises or falls on some future date, the buyer or seller can minimize the risk involved through the use of forward contracts to offset the fluctuation in price from the date of the agreement to the actual date of transfer or delivery." H.R. Rep. 101-84, at 4 (1990). Whether the maturity date is determined on a case-by-case basis to be the date of delivery, *see Knauer v. Superior Livestock Auction, Inc. (In re E. Livestock Co.)*, Ch. 11 Case No. 10-93904-BHL-11, Adv. No. 11-59088, 2012 WL 4210347, at *4 (Bankr. S.D. Ind. Apr. 5, 2012) ("This Court agrees that the maturity date is the date on which delivery is made, insofar as that date completes the sellers' obligations under the forward contract and triggers the buyers' obligation

to settle the account."), or the date on which payment is required, *Renew Energy*, 463 B.R. at 480 ("a common sense (and usage) definition of 'maturity date' is the date that all other obligations under the contract have been performed, and nothing else need be done except tender payment"), the focus should be on when the benefits or detriments of the contract are realized. Such a definition best captures Congress's intent in protecting forward contracts from preference actions and best accords with the broad protections afforded in the Bankruptcy Code.

Under this definition of maturity date, it is unclear whether a factual dispute exists as to the maturity dates of the contracts. After the parties had agreed on a basis price they would execute a document entitled Confirmation of Pricing And/Or Contract Amendment ("Pricing Confirmation Document"). *See* Trustee's Br. in Support of Mot. for Summ. J., Ex. L (Doc. No. 47). Each Pricing Confirmation Document included the basis price, the futures price, the date the parties agreed to the contract, and an estimated quantity of corn to be withdrawn. Following the contract finalization and weekly corn usage, Perdue would submit an invoice entitled Sales Settlement Sheet. *See* Trustee's Br. in Support of Summ. J., Ex. Q (Doc. No. 47). Each Sales Settlement Sheet included the total price the parties had agreed, the usage dates, and the amount of corn that had been withdrawn from the storage bins during the usage period. Perdue submitted approximately eleven Sales Settlement Sheets to Clean Burn during the Preference Period.

After comparing the Pricing Confirmation Documents with the Sales Settlement Sheets, it appears that the parties entered into some contracts that matured in more than two days, and entered into other contracts that matured in two days or less. One example of a contract that meets this definition is reproduced below:

| Pricing Confirmation Document Number | Pricing Confirmation Document Date | Pricing Confirmation Document Total Price | Sales Settlement Sheet Number | Sales Settlement Sheet Price | Sales Settlement Sheet Usage Dates |
|---|---|---|---|---|---|
| 237-amendment 4 | 12/23/2010 | $7.0450/BU | 294070 | $7.0450/BU | 12/27/2010 - 1/2/2011 |

In this example, by comparing the Pricing Confirmation Document 237 amendment 4, the parties finalized their contract on December 23, 2010, and the parties began to realize the benefits or detriments of their contract when Clean Burn began withdrawing the corn on December 27, 2010.  In contrast, an example of a contract that does not meet this definition is reproduced below:

| Pricing Confirmation Document Number | Pricing Confirmation Document Date | Pricing Confirmation Document Total Price | Sales Settlement Sheet Number | Sales Settlement Sheet Price | Sales Settlement Sheet Usage Dates |
|---|---|---|---|---|---|
| 277-amendment 2 | 2/7/2011 | $7.5725/BU | 316807 | $7.5725/BU | 2/7/2011 – 2/13/2011 |

In this example, the parties finalized their contract on February 7, 2011, and Clean Burn began withdrawing corn on the same day.[8]

Inasmuch as there are instances in which contracts both matured in more than two days and those that did not, and because neither party sufficiently briefed this issue, it is the parties' responsibility to provide the Court with those Sales Settlement Sheets that meet the definition of a forward contract.

---

[8] The Trustee also contends that the price associated with Sales Settlement Sheet number 313673 was determined in accordance with Pricing Confirmation Document 277 amendment 2.  Both Sales Settlement Sheet 316807 and 313673 use the same price, $7.5725, and are associated with the same basis contract number, 277.  No other amendment to basis contract number 277 lists this price other than amendment 2.  Therefore, assuming that Pricing Confirmation Document 277 amendment 2 fixed the price for Sales Settlement Sheet 313673, this transaction had a maturity date of two days or less.  According to Sales Settlement Sheet 313673, corn was used from February 4 through February 6, 2011, but the Pricing Confirmation Document 277 amendment 2 lists a contract date of February 7.

B.  Settlement payment

With respect to those transactions that do meet the definition of a forward contract, the second requirement to prevent avoidance under § 546(e) is that the transfers were settlement payments.  The Bankruptcy Code defines settlement payments as including preliminary, partial, interim, final, and net settlement payments "or any other similar payment commonly used in the forward contract trade."  11 U.S.C. §§ 101(51A), 741(8).  Despite being "a definition in name only . . . a commodity 'settlement payment' must, at the least, be some kind of payment on a commodity forward contract."  *Buchwald v. Williams Energy Mktg & Trading, Co. (In re Magnesium Corp. of Am.)*, 460 B.R. 360, 368 (Bankr. S.D.N.Y. 2011); s*ee also* 5 Collier on Bankruptcy ¶ 546.06[2][b] (Alan N. Resnick and Henry J. Sommers eds., 16th ed. 2015) ("the term 'settlement payment' should be interpreted very broadly.").  All of the transfers made during the Preference Period were payments made to settle Clean Burn's obligations under the contracts.  Therefore, to the extent that contacts entered into during the Preference Period were forward contracts, the second requirement under § 546(e) is met.

C.  Forward Contract Merchant

The final requirement for establishing protection under the safe harbor of § 546(e) is to prove that the transfers were made by a forward contract merchant.  The Bankruptcy Code defines a forward contract merchant as "an entity the business of which consists in whole or in part of entering into forward contracts or with merchants in a commodity (as defined in section 761)."  11 U.S.C. § 101(26).  In an effort to give meaning to every word in the statutory definition, one court persuasively defined a forward contract merchant as "a person that, in order to profit, engages in the forward contract trade as a merchant or with merchants," with "merchant" defined as "one that is not acting as either an end-user or a producer."  *Mirant Ams.*

*Energy Mktg, L.P. v. Kern Oil & Ref. Co. (In re Mirant Corp.)*, 310 B.R. 548, 567-68 (Bankr. N.D. Tex. 2004).

There can be no doubt that Perdue was a merchant.  Perdue procured corn from independent sources in order to sell it to Clean Burn, who acted as the end-user of the corn.  In an effort to bolster its forward contract merchant bona fides, Perdue claims that it entered into forward contracts with two other companies.  Clean Burn stressed during oral argument that the Court needed to examine Perdue Bioenergy's business, and not that of its parent corporation, Perdue Agribusiness, to determine specifically whether Perdue Bioenergy engaged in the trade of corn for a profit.  Regardless of whether Perdue Bioenergy conducted multiple corn-trading transactions with other entities, there is no dispute that it traded in corn with Clean Burn to make a profit.  The statutory definition broadly defines a forward contract merchant as an entity whose business "in whole or in part" consists of entering into forward contracts.  11 U.S.C. § 101(26).  Therefore, to the extent that Perdue entered into forward contracts with Clean Burn, it is a forward contract merchant under § 101(26).[9]  Thus, those contracts which did have maturity dates greater than two days after the date of contracting qualify for exclusion from avoidance under § 546(e).

IV.    Section 547(c) defenses

For those contracts which do not qualify for the § 546(e) defense, Perdue also raised new value defenses under §§ 547(c)(1) and (4), and an ordinary course of business defense under § 547(c)(2).  Section 547(c)(1) prevents a trustee from avoiding a preferential transfer "to the

---

[9] The Court is mindful that the *Mirant* court rejected the simplistic definition of a forward contract merchant as "a person that enters into forward contracts," because it would "violate the judicial corollary to Occam's Razor: that each word in a statute has significance and must be given meaning in construing the statute."  *In re Mirant Corp.*, 310 B.R. at 567.  While this Court agrees that the definition of a forward contract merchant must mean something more than a party that enters into a forward contract, the statutory definition is purposefully broad.  The limiting language in § 101(26) narrows its expansive reach to merchants engaged in business.  Perdue fits the definition of a merchant and its activity conforms to the term "business."

extent that such transfer was—(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."  11 U.S.C. § 547(c)(1).  Similarly, § 547(c)(4) prevents the trustee from avoiding preferential transfers "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor— (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."  11 U.S.C. § 547(c)(4).  Perdue relies on its own definition of delivery, in which Perdue delivered corn to Clean Burn when it passed over the weighbelt, as the basis for both defenses.  Because this Court already determined that the corn was delivered, at the latest, when it arrived at Clean Burn's facility, the payments made during the Preference Period were not made contemporaneously with the delivery of the corn.  Therefore, Perdue's Motion for Summary Judgment as to its §§ 547(c)(1) and (4) defenses must be denied.

Perdue's ordinary course of business defense under § 547(c)(2) raises factual issues that this Court cannot decide at this time.  Section 547(c)(2) prevents the trustee from avoiding preferential transfers to the extent that the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee" or, alternatively, were "made according to ordinary business terms."  11 U.S.C. § 547(c)(2).  Perdue acknowledges that the subjective prong of § 547(c)(2) is a "peculiarly factual analysis," that requires this Court to consider "(1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition."  *Conti v. Sampson-Bladen Oil Co.*

*(In re Clean Burn Fuels, LLC)*, Ch. 7 Case No. 11-80562-7D, Adv. No. 12-9081, 2014 WL 2987330, at *5 (Bankr. M.D.N.C. July 1, 2014) (citations omitted).  Both Perdue and Clean Burn dispute whether a baseline of dealing can be established and whether the payments made during the Preference Period differed from their past practices.  Furthermore, the parties raise factual disputes concerning the objective prong of § 547(c)(2) by disagreeing over the proper industry to consider and what terms are common in that industry.  Therefore, Perdue's § 547(c)(2) defense is not ripe for summary judgment.

<u>Conclusion</u>

In light of the foregoing, the Trustee has established the prima facie elements of a preference under § 547(b).  Therefore, the Trustee's Motion for Summary Judgment as to § 547(b) is GRANTED.

With respect to Perdue's Motion for Summary Judgment as to its § 546(e) defense, the Trustee has identified two contracts for which the maturity date is two days or less after the date of contacting.  The Trustee is ordered to present the Court with a list within thirty days of any additional contracts for which it contends the maturity date is two days or less than the date of contracting.  If the Trustee does not provide this list, the Court will enter an order granting summary judgment as to all other contracts and denying summary judgment as to the two contracts previously identified.

With respect to Perdue's § 547(c)(1) and (4) defenses, this Court finds its previous ruling in the Corn Litigation precludes granting Perdue summary judgment.  Perdue's Motion for Summary Judgment is therefore DENIED.

With respect to Perdue's § 547(c)(2) defense, this Court finds that there are material issues of fact such that summary judgment is not appropriate.  Therefore, Perdue's Motion for Summary Judgment as to its § 547(c)(2) defense is DENIED.

IT IS SO ORDERED.

END OF DOCUMENT

SERVICE LIST

Sara Conti
Trustee

JP Cournoyer
Vicki Parrott
Attorneys for Trustee

Gregory Crampton
Attorney for Defendant

C. Carey Deeley, Jr.
Frederick W. H. Carter
Andrew J. Currie
VENABLE LLP
210 West Pennsylvania Ave.,
Suite 500
Towson, MD  21204